UNITED STATES of America, Plaintiff,

v.

Dario JARAMILLO, Defendant.

No. CRIM. A. 95–387(AJL).

United States District Court,
D. New Jersey.

April 13, 1998.

Paula T. Dow, Assistant U.S. Attorney, Office of the United States Attorney, Newark, NJ, for United States of America.

Peter J. Torcicollo, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Dario Jaramillo.

## OPINION

LECHNER, District Judge.

After a jury trial, defendant Dario Jaramillo ("Jaramillo") was found guilty of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. After sentencing, Jaramillo appealed and argued, *inter alia,* he had improperly received a two-point upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1 ("Section 3C1.1"). While the appeal was pending, the Circuit decided *United States v. Arnold,* 106 F.3d 37 (3d Cir.1997), which set forth requirements for upward enhancements pursuant to Section 3C1.1. Because the holding of *Arnold* directly impacts the Section 3C1.1, as in effect for purposes of this case, sentencing issue, this matter was remanded for resentencing on this narrow issue.[1] On 16 January 1998, Jaramillo also submitted, a *pro se,* "Motion For Sentencing Departure Pursuant To U.S.S.G § 5K2.0 Based On Post–Conviction Rehabilitation Efforts" (the "Motion for Sentencing Departure").[2]

On 6 April 1998, a hearing (the "6 April 1998 Hearing") was held on the Section 3C1.1 sentencing issues.

*Facts*[3]

On 2 August 1995 a grand jury returned an indictment against Jaramillo for conspiracy to possess with intent to distribute approximately 950 grams of heroin. The trial commenced on 17 October 1995 and the jury returned a verdict on 19 October 1995 at approximately 9:25 o'clock a.m.; Jaramillo was found guilty.

On 19 October 1995 following the return of the jury verdict, this matter was set for sentencing on 25 January 1996 (the "25 January 1996 Sentencing Hearing"). At the 25 January 1996 Sentencing Hearing, counsel for Jaramillo,[4] without prior notice to the court or to the Government, requested an adjournment to permit Jaramillo the opportunity to speak with the probation officer who drafted the presentence report (the "Presentence Report"). *See* Transcript of 25 January 1996 Sentencing Hearing at 3–7. The request was granted; the matter was rescheduled for sentencing on 8 February 1996 (the "8 February 1996 Sentencing Hearing") at 11:00 o'clock a.m. *See id.* at 6.

During the 8 February 1996 Sentencing Hearing, counsel to Jaramillo at the time announced he wished to call Jaramillo to the stand to testify under oath. *See* Transcript of 8 February 1996 Sentencing Hearing at 3. When asked whether notice of this was given to either the court or the Assistant United States Attorney, counsel to Jaramillo indicated notice had not been given. *See id.* at 3–5. Accordingly, after Jaramillo was sworn and testified, the matter was carried from 8 February to 13 February 1996 in order to permit the Assistant United States Attorney time to

---

1. The Third Circuit recognized "[o]bviously the district court here did not articulate the *Arnold* requirements because we had not yet decided them, nor did the [G]overnment or the defense structure its arguments in accordance with these standards." *United States v. Jaramillo,* No. 95–5748, at 4 (3d Cir. 28 Oct. 1997). The Third Circuit also noted "the enhancement for a managerial role in the offense [pursuant to U.S.S.G. § 3B1.1(c) ("Section 3B1.1(c)")] and the denial of the safety valve reduction [pursuant to U.S.S.G. § 2D1.1(b)(4) ("Section 2D1.1(b)(4)")], do not give us pause. We do not find any error in the district court's decisions in this regard." *Id.* at 5.

2. In support of his arguments raised with respect to the resentencing, Jaramillo submitted: a letter-brief, dated 15 December 1997, with attached Exhibits A–E (the "Jaramillo Letter–Brief").

In opposition to the arguments raised, the Government submitted: a letter-brief in opposition,

dated 16 December 1997 (the "Government Letter–Brief").

In support of the Motion for Downward Departure, Jaramillo submitted: Motion For Sentencing Departure Pursuant to U.S.S.G. § 5K2.0 Based On Post–Conviction Rehabilitation Efforts with attached Exhibits (the "Brief in Support of Downward Departure"); Defendant's Reply to Plaintiff's Response To His Motion For Sentencing Departure Pursuant to U.S.S.G. § 5K2.0 with attached Exhibit (the "Reply").

In opposition, the Government submitted: a letter-brief in opposition, dated 31 January 1998 (the "Opposition to Sentencing Departure").

3. The facts are taken from the 11 March 1996 opinion (the "11 March 1996 Opinion") of this court.

4. Jaramillo was represented by Antonio Velazquez, Esq. during the trial of the charged offense.

gather evidence and prepare for cross-examination. *See id.* at 12–15.

On 13 February 1996 (the "13 February 1996 Sentencing Hearing"), Jaramillo was cross-examined by the Assistant United States Attorney and his testimony was completed. Thereafter, Jaramillo declined to offer other testimony concerning his sentencing. *See* Transcript of 13 February 1996 Sentencing Hearing at 15. The Government then offered the testimony of Special Agent Peter Edge.

Jaramillo was sentenced on 28 February 1996 (the "28 February 1996 Sentencing Hearing") pursuant to the Pre–Sentence Report, prepared by the United States Probation Office (the "Probation Office") on 4 December 1995, revised by the Probation Office on 30 January 1996 and supplemented by a memorandum from the Probation Office, dated 8 February 1996. Jaramillo was also sentenced based upon testimony offered at the 8 and 13 February 1996 Sentencing Hearings. The Pre–Sentence Report included the following calculations:

### Offense Level Computation

35. The 1995 edition of the Guidelines Manual has been used in this case.

*Count One*—Conspiracy to Possess with Intent to distribute approximately 696 Grams of Heroin.

36. **Base Offense Level:** The United States Sentencing Commission Guideline for violation of 21 U.S.C. § 841(a)(1) is found in U.S.S.G. § 2D1.1(a)(3)(c)(6) and calls for a base offense level of 28. — 28

37. **Specific Offense Characteristic:** None. — 0

38. **Victim–Related Adjustments:** None. — 0

39. **Adjustments for Role in the Offense:** Pursuant to U.S.S.G. § 3B1.1(c) [ ("Section 3B1.1(c)") ], the offense is increased two levels. — +2

40. **Adjustment for Obstruction of Justice:** None. — 0

41. **Adjusted Offense Level (Subtotal):** — 30

42. **Adjustment for Acceptance of Responsibility:** — 0

43. **Additional Adjustment for Acceptance of Responsibility:** — 0

44. **Total Offense Level:** — 30

45. **Chapter Four Enhancements:** None. — 0

46. **Total Offense Level:** — 30

Pre–Sentence Report at 8–9.

Jaramillo objected to a two-level increase imposed for his role in the offense pursuant to Section 3B1.1(c)[5] and argued there was no testimony substantiating the increase for organizer, leader, manager, or supervisor status. *See* 11 March 1996 Opinion at 14–15. Jaramillo also argued for a two-point reduction for minimum participation pursuant to U.S.S.G. 3B1.2(b). *See id.* at 15.

It was determined the two-level aggregating role adjustment pursuant to Section 3B1.1(c) was applicable because Jaramillo recruited his co-defendant Victor Rodriguez ("Rodriguez") and organized and financed the instant drug conspiracy.[6] *See* 31 March 1996 Opinion at 15. The facts establish Jaramillo directed and controlled at least one individual; that individual was Rodriguez. *See id.* In addition, although a mitigating

---

5. Section 3B1.1(c) provides in relevant part: Based upon the defendant's role in the offense, increase the offense level as follows: ... "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity ... increase [the offense level] by two levels." *Id.* An enhancement under Section 3B1.1(c) is appropriate "if the defendant directed and controlled at least one individual." *United States v. Bethancourt,* 65 F.3d 1074, 1081 (3d Cir.1995), *cert. denied,* 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *see also United States v. King,* 21 F.3d 1302, 1305 (3d Cir.1994); *United States v. Katora,* 981 F.2d 1398, 1402 (3d Cir.1992).

6. Specifically, it was determined Jaramillo gave Rodriguez money to leave the United States on 25 July 1995 for Aruba and to return to the United States on 28 July 1995. *See* 31 March 1996 Opinion at 15. These facts indicate Jaramillo had a greater degree of control and authority in the commission of this crime than the other participants.

role adjustment may be awarded if a defendant is "substantially less culpable than the average participant," *see* Commentary to Section 3B1.2.(b), the conduct of Jaramillo, as reflected in the Pre–Sentence Report, and as the facts developed at trial revealed, did not support a mitigating role adjustment. *See* 11 March 1996 Opinion at 15–16.

Jaramillo also contended he qualified for a two-level reduction pursuant to Section 2D1.1(b)(4) which provides that if a defendant meets the criteria set forth in U.S.S.G. 5C1.2(1)-(5) ("Section 5C1 .2") and the offense level is twenty-six or greater, a decrease of two levels is appropriate.[7]

It was determined Jaramillo did not meet the criteria in subsection (4) or subsection (5) of Section 5C1.2. *See* 11 March 1996 Opinion at 17. As indicated, Jaramillo was found to be a leader, organizer, manager, or supervisor of another in the offense, *see* Section 5C1.2(4), and had not truthfully provided to the Government all information and evidence he had concerning the offense.[8] *See* 11 March 1996 Opinion at 17 (citing Section 5C1.2(5)).

At both the 8 February and 13 February 1996 Sentencing Hearings, Jaramillo voluntarily took the witness stand, was sworn and testified concerning the facts and his role in the instant matter. At the conclusion of the 13 February 1996 Sentencing Hearing, the parties were asked to submit briefs with respect to whether a two-point enhancement was warranted by Section 3C1.1, pursuant to *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Specifically, it was stated:

> I'm inclined to enhance the [G]uideline computation two points for obstruction of justice. It seems to me—I'm not ruling at this point, but it seems to me that [Jaramillo's] testimony with regard to many comments he made here were false, willfully false, that he committed perjury and under Section 3C1.1, a two-point enhancement is appropriate.

*See* Transcript of 13 February 1996 Sentencing Hearing at 31.

After submissions received from the Government and Jaramillo were considered, it was determined a two-point enhancement pursuant to Section 3C1.1 was appropriate because Jaramillo committed perjury. *See* Transcript of 28 February 1996 Sentencing Hearing at 521. The 11 March 1996 Opinion stated: "Jaramillo gave false testimony concerning several material matters; he did so with willful intent to provide false testimony, to mislead the [c]ourt and, in effect, to obstruct justice." 11 March 1996 Opinion at 20 (citing *Dunnigan,* 507 U.S. at 95, 113 S.Ct.

---

**7.** Section 5C1.2 of the Guidelines states as follows:

*Limitation of Applicability of Statutory Minimum Sentences in Certain Cases*

In the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable [G]uidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) set forth verbatim below:

(1) the defendant does not have more than [one] criminal history point, as determined under the [S]entencing [G]uidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the Sentencing Guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude, a determination by the court that the defendant has complied with this requirement.

*Id.*

**8.** As previously indicated, the Circuit stated: "[T]he enhancement for a managerial role in the offense [pursuant to Section 3B1.1(c)] and the denial of the safety valve reduction [pursuant to Section 2D1.1(b)(4)], do not give us pause. We do not find any error in the district court's decisions in this regard." *Jaramillo,* No. 95–5748, at 5.

1111; *United States v. Colletti,* 836 F.Supp. 221, 228 (D.N.J.1993), *vacated on other grounds,* 22 F.3d 304 (3d Cir.1994)). Jaramillo's "denial of any supervisory control over Rodriguez" was found to be "false and in conflict with the trial evidence." *Id.* at 19. The testimony of Jaramillo concerning when Jaramillo first learned of Rodriguez's trip to Aruba, and of the statements of Jaramillo regarding paying for Rodriguez's trip to Aruba and providing Rodriguez with certain phone numbers was found to be incredible—false. *See id.*

Combined with a criminal history category of I, it was determined Jaramillo faced a Sentencing Guideline imprisonment range of 121 to 151 months. *See* 11 March 1996 Opinion at 21. Accordingly, Jaramillo was sentenced to 121 months imprisonment, a supervised release term of four years, a $5,000 fine and a $50 special assessment.

After sentencing, Jaramillo appealed. Among other things, Jaramillo appealed the imposition of the two-point enhancement for obstruction of justice based upon the finding that he perjured himself during sentencing. The case is now before this court pursuant to the decision of the Third Circuit, which remanded the instant matter for resentencing on the narrow issue regarding the enhancement requirements articulated in *Arnold.*[9]

*Discussion*

I. *Enhancement for Obstruction of Justice*

Section 3C1.1 of the Sentencing Guidelines provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by [two] levels.

*Id.*

As mentioned, while the instant matter was pending on appeal, the Third Circuit decided *Arnold.* In *Arnold,* the district court, when considering a post-trial motion for acquittal, independently reviewed the trial testimony in deciding whether the defendant had committed perjury. *See* 106 F.3d at 43. The district court found the claim of innocence asserted by the defendant was unbelievable, the claim was belied by tape-recorded conversations of the defendant, and the testimony of the defense witnesses was implausible in light of tape-recorded conversations and conflicting testimony by other witnesses. *See id.* Concluding that the testimony of the defendant was "willfully false," the district · court enhanced the applicable base offense level by two points for perjury pursuant to Section 3C1.1. *See id.*

◼ In remanding the *Arnold* case for further findings, the Circuit held Section 3C1.1 contained an implied requirement of proof by clear and convincing evidence.[10] *See Arnold,* 106 F.3d at 44. In addition, the Circuit ruled that when applying the Section 3C1.1 upward adjustment, a district court must "evaluate a defendant's alleged false testimony or statements 'in a light most favorable to the defendant'" and place the burden of proof upon the Government. *Id.* at 44 (quoting Application Note One to 3C1.1 of the 1995 Sentencing Guidelines) ("Application Note One").[11]

---

9. *See* n. 1, *supra.*

10. The Sentencing Commission has amended Application Note One so that its present version, which is inapplicable to the instant matter, "no longer suggests the use of a heightened standard of proof. Instead, it clarifies that the court should be mindful that not all inaccurate testimony or statements reflect a willful attempt to obstruct justice." *See* U.S.S.G. Appendix C, Amendment 566 (1997) ("Amendment 566"). Amendment 566 is effective as of 1 November 1997. *See id.*

11. At the time Jaramillo committed his offense and at the time of the 28 February 1996 Sentenc-

ing Hearing, Application Note One read, in relevant part:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) ... is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant.

Application Note One.

As mentioned, effective 1 November 1997, Application Note One was amended and substitutes

Here [in *Arnold*], it is unclear what standard of proof the district court used when reaching its determination that [the defendant] had committed perjury. Moreover, because there is no indication in the record that the district judge, when relying on his earlier finding, placed the burden of proof upon the [G]overnment and viewed the evidence in the light most favorable to [the defendant], we conclude that the district judge's decision that [the defendant] committed perjury did not meet the requirements of [Section 3C1.1].

*Id.* Thus, in *Arnold*, the Circuit held the district court, in applying Section 3C1.1, must require the Government establish by clear and convincing evidence that it is more likely than not that the defendant has been untruthful and should view the evidence in the light most favorable to the defendant. *See id.*

Jaramillo notes that before the Supreme Court decided *Dunnigan*, the Third Circuit had discussed the application of Section 3C1.1 in *United States v. Colletti*, 984 F.2d 1339 (3d Cir.1992). In *Colletti*, the Circuit formulated, in dicta, a standard for a two-level enhancement under Section 3C1.1. The *Colletti* court indicated that to warrant an upward adjustment pursuant to Section 3C1.1 "the perjury of the defendant must not only be clearly established, and supported by evidence other than the jury's [sic] having disbelieved, him [or her], but also must be sufficiently far-reaching as to impose some incremental burdens upon the [G]overnment, either in investigation or proof, which would not have been necessary but for the perjury." *Colletti,* 984 F.2d at 1348; *see also United States v. McLaughlin,* 126 F.3d 130, 140 (3d Cir.1997) (quoting *Colletti,* 984 F.2d at 1348).

The Government argues *Arnold* did not modify existing case law construing Section 3C1.1, which recognizes as obstructive behavior instances where the defendant commits, suborns or attempts to commit or suborn perjury. *See* Government Letter–Brief at 4 (citing Application Note 3(b) to Section 3C1.1)("Application Note 3(b)"). Therefore, the Government contends the holding in *Dunnigan,* that perjury alone may be the basis for an obstruction of justice enhancement under Section 3C1.1, remains good law. *See id.*

*Dunnigan* was not limited to deciding the constitutionality of Section 3C1.1. *See Colletti,* 836 F.Supp. at 228. The majority of the *Dunnigan* decision addressed the non-constitutional requirements for imposing an en-

---

the following for the concluding sentence of the above quoted text:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

Amendment 566.

In interpreting the effect Amendment 566 has on authority from the Third Circuit requiring the imposition of a heightened burden when imposing a Section 3C1.1 enhancement in cases before the effective date of Amendment 566, the Circuit explained:

> Although the eliminated sentence can accurately be described as ambiguous with respect to whether a clear and convincing standard is required and although the [Sentencing] Commission's explanation for ... [Amendment 566] uses the word "clarifies," this is not a situation in which the [Sentencing] Commission has amended an application note to resolve an ambiguity by explaining what the intent behind the ambiguous provision was. The [Sentencing] Commission's explanation ac-

knowledges that the concluding sentence of the prior version, which originated in 1990, suggested a standard higher than a preponderance of the evidence and indicates that it was stricken to eliminate that suggestion for the future. Moreover, it is clear from a comparison of the texts of the new sentence and the stricken one that the new sentence was not intended to set forth the intended meaning of the stricken one. Rather, the new sentence is intended to clarify the intended application of the [G]uideline and the application notes by calling attention to the 1993 teachings of the Supreme Court in [*Dunnigan*]. Accordingly, this is not a situation in which we, as a panel, are free to reexamine our decision in [*Arnold*], in light of the subsequent amendment to Application Note [One]. *Cf. United States v. Joshua,* 976 F.2d 844, 855 (3d Cir.1992). The 1990 version of Application Note [One] is applicable here, and we are bound by its interpretation in *Arnold*. *See United States v. Bertoli,* 40 F.3d 1384, [1401] (3d Cir.1994); *United States v. Menon,* 24 F.3d 550 [565–67] (3d Cir.1994).

*United States v. Fiorelli,* 133 F.3d 218, 222 n. 3 (3d Cir.1998). Accordingly, the clear and convincing standard appears to apply in this case, as indicated by *Arnold.*

hancement for perjury under Section 3C1.1. *See id.* (citing *Dunnigan,* 507 U.S. at 92–96, 113 S.Ct. 1111) ("Given the numerous witnesses who contradicted [the defendant] regarding so many facts on which she could not have been mistaken, there is ample support for the [d]istrict [c]ourt's finding.").

In addressing the "incremental burden" concept, the Third Circuit did not purport to address an issue not before the Supreme Court in *Dunnigan.* Rather, the Circuit stated:

> [B]ecause, having granted certiorari in the *Dunnigan* case, the Supreme Court will presumably be resolving the question in the reasonably near future, we deem it unnecessary to express a firm view on the subject at this time. Some brief discussion of the issue may, however, be of assistance to the district court on remand.

*Colletti,* 984 F.2d at 1347.

Jaramillo argues *Arnold* quoted "the holding" from *Colletti* as stating the Third Circuit's Section 3C1.1 requirement includes "some incremental burdens upon the [G]overnment." [12] *See* Jaramillo Letter–Brief at 11–12. This language requiring a showing of an incremental burden was not part of the holding in *Colletti* but was merely dicta provided to "assist[ ] ... the district court on remand." *See Colletti,* 984 F.2d at 1347; *see also Fiorelli,* 133 F.3d at 223. Moreover, this language was not utilized by *Arnold* to support the requirement of a showing of an incremental burden but, rather, to demonstrate the *Colletti* decision "[did] not provide a clear indication of the specific burden of proof to be applied" when deciding if an upward adjustment pursuant to Section 3C1.1 is warranted. *See Arnold,* 106 F.3d at 44.

**12.** Specifically, Jaramillo contends the *Arnold* court "directly quoted the holding from *Colletti*" as establishing the Section 3C1.1 requirements of this Circuit:

> "In our view, in order to warrant the two[-]point enhancement for obstruction of justice, the perjury of the defendant must not only be clearly established, and supported by evidence other than the jury's [sic] having disbelieved [the defendant], but also must be sufficiently far-reaching as to impose some incre-

[■] The Third Circuit in *Fiorelli* explained:

> The quotation in *McLaughlin* regarding the necessity of an "incremental burden" was dicta in that case as well as in *Colletti.* Our confidence that it was not advanced by the *McLaughlin* court as a basis for the conclusion reached comes not only from the text of the opinion but also from the fact that such a holding would have been clearly inconsistent with the application notes and the decision of the Supreme Court in *Dunnigan.* At the time *McLaughlin* was decided, and at the time of Fiorelli's sentencing, as is true today, Application Note 3(b) expressly stated that "committing ... perjury" was "conduct to which this enhancement applies." The Supreme Court took note of this fact in *Dunnigan.* It then went on to observe:
>
> > Were we to have the question before us without reference to this commentary, we would have to acknowledge that some of our precedents do not interpret perjury to constitute an obstruction of justice unless the perjury is part of some greater design to interfere with judicial proceedings.
>
> *Dunnigan,* 507 U.S. at 93, 113 S.Ct. 1111. The Supreme Court concluded, however, that a construction of [Section] 3C1.1 that would require more than proof of the existence of perjury would be "inconsistent with its accompanying commentary." *Id.* at 94, 113 S.Ct. 1111.

133 F.3d at 223. The *Fiorelli* court expressly declined to recognize the incremental burden requirement "as part of the law of ... [the Third] [C]ircuit." *Id.* Accordingly, perjurious testimony by a defendant during sentencing can constitute an obstruction of justice. [13] *See id.* at 221; *Arnold,* 106 F.3d at 42.

mental burdens upon the [G]overnment, either in investigation or proof, which would not have been necessary but for the perjury." Jaramillo Letter–Brief at 11–12 (quoting *Arnold,* 106 F.3d at 43–44).

**13.** By letter, dated 26 February 1998 (the "26 February 1998 Letter"), counsel to Jaramillo conceded, in light of *Fiorelli,* a case decided subsequent to the submission of the Jaramillo Letter–Brief, the Government was not required

In the instant matter, *Arnold* instructs on remand this court is to "support its decision with the findings required by the Supreme Court's decision in *Dunnigan.*" *Arnold*, 106 F.3d at 44. The *Dunnigan* Court set the parameters for the proper application of Section 3C1.1 to a defendant's perjury. To apply the enhancement, the sentencing court must find the defendant "(1) gave false testimony (2) concerning a material matter (3) with the willful intent to provide false testimony." *See Fiorelli*, 133 F.3d at 221 (citing *Dunnigan*, 507 U.S. at 94, 113 S.Ct. 1111). Although *Dunnigan* addressed perjured testimony offered during trial, Section 3C1.1 also applies "during ... sentencing of the instant offense." *See United States v. Dershem*, 818 F.Supp. 785, 790 (M.D.Pa.) (quoting Section 3C1.1), *aff'd*, 16 F.3d 406 (3d Cir.1993), *cert. denied*, 512 U.S. 1223, 114 S.Ct. 2713, 129 L.Ed.2d 839 (1994). Once a determination has been made that the defendant committed perjury at trial or during sentencing proceedings, "an enhancement of sentence is required by [Section 3C1.1 of] the Sentencing Guidelines."[14] *Dunnigan*, 507 U.S. at 98, 113 S.Ct. 1111.

Construing the evidence in the light most favorable to Jaramillo and applying the three-part *Dunnigan* test, the Government has demonstrated by clear and convincing evidence Jaramillo attempted to obstruct or impede the administration of justice during the sentencing phase of the instant case.

The testimony of Jaramillo at the 8 and 13 February 1996 Sentencing Hearings involved significantly more than a mere denial of guilt. While Jaramillo attempted to accept some degree of responsibility, he willfully gave false testimony concerning other material matters, particularly with reference to Section 3B1.1(c), regarding a possible adjustment as an organizer, leader, manager, or supervisor of others in his criminal conduct. For example, Jaramillo testified:

THE COURT: Before you step down, I have one or two questions.

The reason you testified today and last week at this sentencing hearing was to hopefully get a more favorable sentence. Is that correct?

THE DEFENDANT: That is one of the reasons, but I also believe in justice and I feel that if Jorge,[15] [Rodriguez] and I were involved in the commission of this offense, all three of us should pay for it and not only myself.

THE COURT: As far as your involvement, you're hoping through this testimony to receive a more favorable sentence, correct?

THE DEFENDANT: With my testimony, I want to clarify the situation because I understand that the officer said that the investigation was in progress when the arrest was made. I hope to be able to help them so I can, too.

THE COURT: Is your purpose to obtain a better sentence than you would have received if you had not testified?

THE DEFENDANT: Yes, I believe so.

THE COURT: Now, do I also understand your testimony of last week and today to say, in substance, that you deny you directed Rodriguez in any way concerning this drug transaction?

THE DEFENDANT: The only thing that I said to him was that Omar, who was going to go to Aruba to be involved in a drug transaction, and that he should give that message to [Jorge].

THE COURT: Perhaps I was not clear.

Do I understand your testimony last week and today to say, in effect, that you deny you directed Rodriguez in any way concerning the drug transaction?

THE DEFENDANT: Correct.

THE COURT: Do I also understand your testimony of last week and today to deny, in substance, that you had any control over Rodriguez in this drug transaction?

to make a showing of an incremental burden. *See* 26 February 1998 Letter at 2.

14. "If the defendant willfully obstructed or impeded ... the administration of justice during

the ... sentencing of the instant offense, increase the offense level by [two] levels." Section 3C1.1.

15. Jorge and Omar were fellow co-conspirators with Rodriguez and Jaramillo.

THE DEFENDANT: Correct. yes, that is correct because if I did have any relationship it was discussed with his brother.

Transcript of 13 February 1996 Sentencing Hearing at 13–15.

Jaramillo argues a comparison of the statements he made to the Probation Office with his testimony during sentencing, reveals he remained consistent with respect to his version of his role in the charged offense. *See* Jaramillo Letter–Brief at 13. The fact that Jaramillo consistently told the same story does not insulate Jaramillo from perjury while making those statements. Viewing the denial of any supervisory control over Rodriguez in the light most favorable to Jaramillo, it has been established by clear and convincing evidence these denials are false and, as well, are in conflict with the trial evidence.

Both witness testimony and documentary evidence introduced at trial established Jaramillo wired money to Rodriguez in Aruba and used a fictitious code name for Rodriguez. At the time of his arrest, Jaramillo possessed a telephone book bearing the New York telephone number for Rodriguez and the telephone number in Columbia for Omar.[16] Jaramillo also possessed a slip of paper bearing the phone number of the Aruba hotel, the room number for Omar in that hotel, the name of Rodriguez and the amount of money Jaramillo wired to Rodriguez. In addition, Jaramillo gave Rodriguez twenty

dollars at the airport to take a cab to New York even though he claimed he went to the airport to pick up Rodriguez.[17]

At sentencing Jaramillo testified he did not know Rodriguez was in Aruba until he received a message from Rodriguez when Rodriguez was in fact in Aruba. *See* Transcript of 8 February 1996 Sentencing Hearing at 8–9. The uncontradicted, credible testimony of Rodriguez at trial demonstrated Jaramillo knew Rodriguez had flown to Aruba to collect the drugs; Jaramillo had both arranged the trip and paid for the airline tickets in advance. In addition, Rodriguez was credible when he testified Jaramillo provided him with his New Jersey work number to use when Rodriguez needed to communicate with Jaramillo.

At sentencing, Jaramillo raised for the first time a supposed threat to his family during the trial as a reason why he remained silent and did not testify. *See* Transcript of 8 February 1996 Sentencing Hearing at 10. No corroboration was offered in support of this alleged threat. Viewing the testimony of Jaramillo in a light most favorable to him, it is clear from the demeanor and manner in which Jaramillo testified, his testimony was incredible. In further support and by way of contrast, Special Agent Peter Edge testified that in the weeks before the trial, agents from the U.S. Customs Service had heard from Rodriguez and from the attorney for Rodriguez that threats had been made on

---

**16.** As previously indicated, Omar was a co-conspirator with Rodriguez and Jaramillo.

**17.** Jaramillo contends the role he played in the instant conspiracy was not an element of the charged offense. *See* Jaramillo Letter–Brief at 15. Jaramillo contends "[b]ecause the jury did not find that [he] was in any type of supervisory role with respect to the charged offense, there is no basis for a finding of perjury in this matter." *Id.; see also* Transcript from 6 April 1998 hearing at p. 3, lines 18 to p. 4, line 15. Jaramillo further argues the jury never had the opportunity to evaluate his credibility vis-a-vis the proofs at trial. Jaramillo Letter–Brief at 14. Additionally, Jaramillo argues the jury might "have believed [his] testimony, yet still convicted him, inasmuch as his testimony at the Sentencing Hearing alone may have been sufficient for a finding of guilt as to the charged offense." *Id.*

The arguments of Jaramillo are misplaced. As indicated, an upward adjustment pursuant to

Section 3C1.1 can be based upon the testimony a defendant presented at trial or during sentencing. *See* Section 3C1.1; *Dershem,* 818 F.Supp. at 790. In the instant matter, the testimony of Jaramillo during the 8 February and 13 February 1996 Sentencing Hearings did not concern a denial of guilt but a denial of any type of supervisory role in order to receive a more favorable sentence. The fact that the testimony of Rodriguez at trial indicating Jaramillo was in a supervisory role "was unchecked at trial" and that the jury did not find that Jaramillo played a supervisory role in the instant conspiracy is irrelevant to the instant determination. There is no requirement that Jaramillo had to have testified to the contrary during trial in order to warrant the application of the two-level enhancement under Section 3C1.1. Also, it was not for the jury to decide whether Jaramillo played a supervisory role. *See* Transcript from 6 April 1998 Hearing at p. 4, lines 13–14. The false testimony of Jaramillo during sentencing is sufficient to impose the increase pursuant to Section 3C1.1.

behalf of Jaramillo directed at the family of Rodriguez. *See* Transcript of 13 February 1996 Sentencing Hearing at 17–18.

Without doubt, the testimony from Jaramillo was targeted to a material matter in the sentencing—first to convince the court he was not a manager, leader or supervisor under Section 3B1.1(c) and, second, to obtain a two-level reduction pursuant to Section 5C1.2.

The statements made by Jaramillo during sentencing were designed and intended to substantially affect the outcome of the case. On 13 February 1996, Jaramillo admitted the reason he had testified at sentencing was to obtain a more favorable sentence from the court.[18] *See* Transcript of 13 February 1996 Sentencing at 13–14. The *Dunnigan* Court recognized it is appropriate for a sentencing judge to conclude a defendant who commits an offense and then commits perjury in an illegal attempt to avoid responsibility for the offense "is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process." 507 U.S. at 97, 113 S.Ct. 1111.

An enhancement is not appropriate for a mere denial of guilt or a mere assertion of innocence. *See* Application Note One. The enhancement in the instant matter was not based upon either a mere denial of guilt or a mere assertion of innocence. It was clear from the observation of Jaramillo's demeanor, comportment and the manner in which he testified, as well as the content of his testimony, that he was lying. Viewing the testimony or statements "in the light most favorable to" Jaramillo, Jaramillo falsely testified as to several material matters; he did so with willful intent to provide false testimony, to mislead the court and, in effect, to obstruct justice. *See Dunnigan*, 507 U.S. at 95, 113 S.Ct. 1111; *Fiorelli*, 133 F.3d at 221; *Arnold*, 106 F.3d at 44; *Colletti*, 836 F.Supp.

at 228. There is no basis to argue, and indeed no argument was offered, that this testimony was the product of a mistake or faulty memory or even confusion. I am "clearly convinced that it is more likely than not that [Jaramillo] has been untruthful." *Arnold*, 106 F.3d at 44.

Under the standard articulated in *Dunnigan*, and as demonstrated by clear and convincing evidence, the burden applicable to the instant matter, the testimony of Jaramillo constituted obstruction of justice which warrants an upward adjustment of two points under Section 3C1.1. Accordingly, the total offense level was corrected from 30, as calculated by the Probation Office, to 32 as a result of the two-point enhancement for obstruction of justice based upon the perjured testimony offered by Jaramillo at the 8 February and 13 February 1996 Sentencing Hearings. The appropriate Sentencing Guideline range was properly calculated as 121 to 151 months.

## II. *Motion for Downward Departure*

Jaramillo, proceeding *pro se*, filed the Motion for Downward Departure which argues his post-offense and post-conviction rehabilitation efforts demonstrate "enough efforts and the degree of acceptance of responsibility . . ., that was [sic] substantially in excess of that ordinarily present and sufficient to remove his case from heartland of applicable [G]uideline." Brief in Support of Downward Departure at 2.

In support of this contention, Jaramillo relies upon *United States v. Sally*, 116 F.3d 76 (3d Cir.1997), where the Circuit held:

[P]ost-offense rehabilitation efforts, including those which occur post-conviction, may constitute a sufficient factor warranting a downward departure provided that the efforts are so exceptional as to remove the

---

18. As previously set forth, during the 13 February 1996 Sentencing, Jaramillo testified:

THE COURT: The reason you testified today and last week at this sentencing hearing was to hopefully get a more favorable sentence. Is that correct?

THE DEFENDANT: That is one of the reasons, but I also believe in justice and I feel that if Jorge, [Rodriguez] and I were involved in the

commission of this offense, all three of us should pay for it and not only myself.

. . . .

THE COURT: Is your purpose to obtain a better sentence than you would have received if you had not testified?

THE DEFENDANT: Yes, I believe so.

Transcript of 13 February 1996 Sentencing Hearing at 13–14.

particular case from the heartland in which the acceptance of responsibility guideline[, Section 3E1.1,] was intended to apply.

*Id.* at 80.

While the Circuit refrained from specifying the particular conduct which will satisfy this standard, the Circuit stressed that such post-offense or post-conviction efforts must be "exceptional or extraordinary examples of rehabilitation efforts." *See Sally,* 116 F.3d at 81. The Circuit further emphasized that such rehabilitation efforts should be "remarkable and indicate real, positive behavioral change," and, that, "at a minimum, there must be evidence demonstrating that a defendant has made concrete gains towards turning his [or her] life around before a sentencing court may properly rely on extraordinary post-conviction rehabilitation efforts as a basis for a downward departure." *Sally,* 116 F.3d at 81.

■ Jaramillo indicates he has become involved in a number of activities while incarcerated. *See* Brief in Support of Downward Departure at 2. In support of the Motion For Downward Departure, Jaramillo relies upon his Federal Corrections Institution Fort Dix ("Fort Dix") Progress Report, dated 8 January 1998, (the "Progress Report"). The Progress Report indicates Jaramillo completed three classes which are part of the Adult Continuing Education Program, he has continuously received outstanding work reports from his detail supervisor, he is not considered a management problem and he has maintained a clear conduct record during his period of confinement. *See* Progress Report attached to Brief in Support of Downward Departure. Jaramillo has also submitted a Certificate of Completion for landscaping maintenance, a Certificate of Participation in the Fort Dix Advanced English as a Second Language Program, a Certificate of Achievement for his completion of the Fort Dix Drug Education Program and a transcript documenting his grade of C from Mercer County Community College in Trenton, New Jersey. *See* Exhibits attached to Brief in Support of Downward Departure.

Jaramillo also reports he has tutored other Spanish-speaking inmates in their reading, writing and General Education Development ("GED") test preparation. *See* Brief in Support of Downward Departure at 3.

Jaramillo cites a number of cases from other circuits in which courts have exercised discretion to downwardly depart based upon extraordinary rehabilitative efforts. *See* Reply at 3–4 (citing *United States v. Kapitzke,* 130 F.3d 820 (8th Cir.1997); *United States v. Brock,* 108 F.3d 31 (4th Cir.1997); *United States v. Griffiths,* 954 F.Supp. 738 (D.Vt. 1997); *United States v. Dyce,* 975 F.Supp. 17 (D.D.C.1997)).

In response, the Government argues while the post-conviction conduct of Jaramillo is laudable, these achievements, viewed as a whole, fail to demonstrate an exceptional or extraordinary post-conviction rehabilitation warranting a downward departure. *See* Opposition to Sentencing Departure at 4.

The Government argues the work progress and evaluation of "outstanding" received by Jaramillo are consistent with his work experience before he was incarcerated. *See* Opposition to Sentencing Departure at 4. Specifically, the Government refers to paragraph 57 of Jaramillo's Final Pretrial Sentencing Report, which indicates Jaramillo worked as a greens keeper at a country club from February 1989 to October 1990 and from February 1992 to February 1994. *See id.* The Government argues this previous employment experience is consistent with the current position of a landscaper held by Jaramillo. *See id.* The Government concludes the rating of "outstanding" received by Jaramillo in this area does not demonstrate any extraordinary or exceptional post-conviction rehabilitation.[19] *See id.*

The Government also credits Jaramillo for his willingness to take advantage of the course offerings available to him in an effort to better himself and especially commends him for assisting others to do the same; however, the Government contends his efforts do not demonstrate an exceptional or

---

**19.** Jaramillo contends he voluntarily chose this position requiring "hard labor" because it was

consistent with his experience. *See* Reply at 7.

extraordinary example of reformation and, therefore, should not form a basis for a downward departure. *See* Opposition to Sentencing Departure at 4.

The Government further argues these efforts have resulted in Jaramillo earning good time credits which will lead to a reduction in his sentence, will support a more favorable release recommendation and will assist him in becoming a "more well rounded, complete individual which will assist in his reentry into society once his sentence has been served." Opposition to Sentencing Departure at 4. The Government notes, pursuant to 18 U.S.C. § 3624(b) ("Section 3624(b)"), a prisoner can earn up to fifty-four days per year in good time credits which will be deducted from a sentence for "exemplary compliance with institutional disciplinary regulation." *See id.* (quoting Section 3624(b)). In assessing whether an inmate is awarded good time credits, the Bureau of Prisons "shall consider whether the prisoner, during the relevant time period, has earned, or is making satisfactory progress toward earning, a highschool diploma or equivalent degree." *Id.* (quoting Section 3624(b)).

Jaramillo completed highschool before entering prison. The Government contends while his educational advances exceed the highschool/GED contemplated by Section 3642(b), the fact that he completed these courses is not demonstrative, without more, of exceptional or extraordinary achievements.[20] *See* Opposition to Sentencing Departure at 4.

The arguments proffered by the Government are persuasive. While the efforts of Jaramillo in prison are commendable, they do not demonstrate extraordinary accomplishments showing real, positive behavioral changes in Jaramillo or efforts which are "so exceptional as to remove [this] particular case from the heartland in which the acceptance of responsibility guideline was intended to apply." *See Sally,* 116 F.3d at 80. Accordingly, the Motion for Downward Departure is denied.

*Conclusion*

For the reasons stated, the two-level upward adjustment for obstruction of justice, established by independent findings viewed in a light most favorable to Jaramillo, is sufficiently supported by clear and convincing evidence. Also, the Motion for Downward Departure is denied.

---

**20.** Also, the Government indicates William Langehennig ("Langehennig"), Jaramillo's Case Manager at Fort Dix, has advised that the outstanding evaluation received by Jaramillo will benefit him in the future as it will support a release recommendation by the institution that Jaramillo can be released to a half-way house. *See* Opposition to Sentencing Departure at 4. The Government further indicates Langehennig also reported a significant number of inmates avail themselves of the educational programs offered at Fort Dix. *See id.* The Government, has not submitted an affidavit or affirmation by Langehennig attesting to such information and Jaramillo disputes the accuracy of the interpretation of these statements by the Government. *See* Reply at 8. Jaramillo contends enrollment in the college courses is limited to 150 inmates and 1850 prisoners are housed at Fort Dix. *See id.* Additionally, Jaramillo contends the college classes are never fully enrolled. *See id.* Due to these discrepancies, the statement attributed to Langehennig was disregarded.